COMMONWEALTH vs. JOSEPH F. REGO
(and five companion cases [1]).

Suffolk.  September 13, 1971. — November 5, 1971.

Present: TAURO, C.J., CUTTER, REARDON, BRAUCHER, & HENNESSEY, JJ.

*Homicide. Evidence,* Judicial discretion. *Practice; Criminal,* Speedy
trial, New trial, Verdict, Capital case.

At the joint trial of three defendants for murder of a maintenance
supervisor in a factory, who had considerable money of his own
with him when he left home on a Saturday night to check the plant
and whose brutally beaten dead body was discovered there by police
about four hours later with only a little change in his clothing,
there was no error in the judge's charge relating to first degree
murder as a killing committed during robbery of the victim of his
own money only, disregarding evidence of theft of money of his
employer from the plant vending machines |390–391|; nor was
there error in the charge relating to deliberate premeditation, in
view of the evidence as to the precise cause of the victim's death
and the admissions of the various defendants concerning what
happened in the factory |391|.
At the trial of an indictment for murder committed in a factory in a
city during a four hour period on a Saturday night, there was no
abuse of discretion in the judge's exclusion from evidence of a
check payable to the defendant and bearing that Saturday's date
and drawn by his aunt, who testified that the defendant had spent
the weekend at her home in a town and as to her memory of the
events related to the check. |391|
There was no error in the denial of motions to dismiss certain
indictments for serious offences for excessive delay in bringing the
defendants to trial where it appeared that there was merely a two-
month period between return of the indictments and arraignment
and a nine-month period between arrest and trial. |391–392|
No abuse of discretion was shown in the denial of motions for a new
trial of indictments for breaking and entering a factory in the
nighttime and murder therein, whether based on testimony of a
witness at the trial and at the hearing on the motions as to an
admission to him by a Commonwealth witness that a footprint

---

[1] The companion cases are by the Commonwealth, one against Joseph F.
Rego, two against John F. Stokes, and two against James J. Stokes.

discovered by police in the factory was his, or based on the Commonwealth's alleged suppression of evidence respecting the footprint, which was not identifiable. [392-393]

There was no error at a murder trial in a procedure not objected to at the time by counsel for the defendants, in that the jury returned verdicts of guilty of murder in the first degree and were then excused from the court room, in that shortly thereafter they were recalled and the judge explained that because of an apparent misunderstanding they had not been asked whether they had a recommendation that the sentence of death be not imposed, and in that the jury then unanimously reported such recommendation. [393]

Where defendants were convicted upon indictments for breaking and entering a factory in the nighttime and for murder of an employee therein, and the charge to the jury properly permitted the return of verdicts under G. L. c. 265, § 1, of guilty of murder in the first degree, or of murder in the second degree which was not related to the crime of breaking and entering, but substantial evidence warranted a conclusion that the killing occurred during the breaking and entering only, and there were no instructions that, absent deliberate premeditation or extreme atrocity or cruelty, such a conclusion warranted verdicts on the murder indictments of no more than guilty of murder in the second degree, this court determined under c. 278, § 33E, that justice would be best served by the entry on the murder indictments of verdicts of guilty of murder in the second degree, and affirmed the judgments upon the breaking and entering indictments. [393-397]

INDICTMENTS found and returned in the Superior Court on August 13, 1969.

The cases were tried before *Hudson*, J.

*John A. Pino* for the defendants John Stokes & another.

*James F. Morelli* for the defendant Joseph F. Rego.

*Thomas J. Mundy, Jr.*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, J.  The three defendants were indicted upon charges of murder in the first degree and breaking and entering in the nighttime.  The defendants were tried together on all indictments and the jury returned verdicts of guilty of murder in the first degree and breaking and entering in the nighttime against each defendant, but the jury recommended that the death sentence be not imposed. The cases are here on appeal under G. L. c. 278, §§ 33A–33G.

The defendants argue five assignments of error: (1) the

judge's failure to charge upon homicide committed during the crime of breaking and entering as a basis for verdicts of guilty of murder in the second degree; (2) the exclusion from evidence of a certain check offered by the defendant John Stokes in connection with alibi testimony offered on his behalf by his aunt Patricia Stoller; (3) the denial of motions to dismiss based upon failure to afford the defendants a speedy trial of the indictments; (4) the denial of the defendants' motions for new trial; and (5) the entry of guilty verdicts after the dismissal of the jury and after verdicts previously reported by the jury.

We summarize the evidence. Armand Cerbone was fifty-two years of age and employed as a maintenance supervisor for the Joseph Pollak Corporation (Pollak's) in its factory at 195 Freeport Street in Dorchester. The factory consists of a large two floor manufacturing building and an office building, with a connecting tunnel between the two buildings. Vending machines for cigarettes, candy and tonic were located on both floors of the manufacturing building. Sanitary machines were located in the ladies' room on the second floor of that building.

During the month of January, 1969, Armand Cerbone worked at Pollak's Monday through Friday from 7 A.M. to 5 P.M. On Saturdays he worked until midafternoon and returned after dark to check the plant by going all through the buildings. Cerbone left home on the evening of Saturday, January 18, 1969, at ten minutes past seven to check the plant. Before he left his wife gave him $30 which he put in his pants pocket. His wife testified that he would usually remain at the plant for about one hour and then would return home. When he had not returned at 8:20 P.M. she telephoned the plant and received no answer. She repeated this procedure a number of times. Police were dispatched to the scene and gained entrance to the plant shortly after 11 P.M.

The police discovered the dead body of Cerbone lying on the floor of the first floor of the factory building near the bottom of the stairway leading to the second floor.

On the left side of Cerbone's forehead was a splitting and gaping laceration two inches in length and about one-eighth of an inch wide. A second gaping laceration on the left side of the head was two and one-quarter inches long and about one-half inch in width. There was a third gaping laceration on the left side of the head one and one-half inches long and about one-eighth inch wide. On the right side in the temporal region there were two other gaping lacerations, one of which was three and one-half inches long and about one inch wide, and the other of which was about one inch long. The autopsy disclosed many fractures and bone chips lying in the macerated brain. The right and left sides of the skull were shattered and fractured by blows. The third finger of Cerbone's left hand had been crushed. In his clothing was found $1.28 in change.

The police at that time discovered a broken window in the cafeteria section on the first floor. They also found that the candy, cigarette and tonic machines on the first floor had been tampered with; that similar machines on the second floor had been forced open and the coins removed; and that sanitary machines in the ladies' room on the second floor had been forced open and one of them ripped from the wall.

Raymond J. DeMore testified that he had known two of the defendants, James Stokes and John Stokes, for a couple of months before January 18, 1969, and the third defendant, Joseph Rego, for "about a year." He first met the defendant Joseph Rego. Rego then introduced him to the defendants James Stokes and John Stokes, who are brothers. On the night of January 18, 1969, he saw Rego and the Stokes brothers at the Lucky Strike Bowling Alley about 7 P.M. He talked to James Stokes in the men's room. He saw a sawed off shotgun about a foot and a half long in a shopping bag carried by James Stokes. In a conversation admitted only against James Stokes the witness was asked by James Stokes if the witness wanted to go down with the Stokes brothers and Rego to Pollak's and break in. James Stokes said he wanted to go there to break in.

John Stokes and Rego then came into the men's room. The following conversation was admitted against all the defendants. John Stokes asked James Stokes if he had told the witness "about it" and James Stokes answered, "Yes." John Stokes asked James Stokes "if he had opened his big mouth about going down to Pollak's" and James Stokes said, "Yes." Rego said he did not want the witness with them; the witness said he did not want to go. The witness and Rego then had a fistfight in the men's room. All three defendants then left the bowling alley building and the witness also went outside and he saw the three defendants walk toward Freeport Street.

On the following day, Sunday, January 19, 1969, the witness again saw the three defendants on the walk of the Lucky Strike Bowling Alley. He had a conversation with James Stokes while the other two defendants stood about fifteen feet away. This conversation was admitted against only James Stokes. The witness asked James Stokes what happened, and James Stokes replied, "Well, what do you think happened?" James Stokes was carrying a paper bag which contained change and crumpled up bills and he said, "We got it from the machines in Pollak's." James Stokes said that he went into Pollak's and the guard caught them; that the guard cornered him in a corner and Rego came up behind the guard and hit him and the man fell to the floor; he beat him to a pulp; John was working on machines upstairs.

In a conversation which also occurred outside the bowling alley, and which was admitted against all the defendants, John Stokes came up to James Stokes and asked James if he had told the witness what happened. James said, "Yes." Rego was standing right next to James when this conversation occurred.

On that same Sunday afternoon about 1:30 P.M. the witness was present when Rego had a conversation with Neil McIsaac, George Grechen and a few other boys at the Lucky Strike Bowling Alley. This conversation was admitted against only Rego. Rego stated he was in trouble;

that he had "beat up" a guard, "him and his two cousins." "

Neil McIsaac testified that on the afternoon of January 19, 1969, at the Lucky Strike Bowling Alley he and several other boys had a conversation with the defendant Rego. This conversation was admitted against Rego only. Rego said he was in trouble; that he might have killed a guard; that last night "him and his cousins" broke into a place and that one of his cousins was cornered, that they hit the guard and he fell to the floor and that was it.

1. Assignment of error 1 deals with the judge's charge upon first degree murder. The defendants contended in their objections after the charge that the evidence did not permit an inference that the killing occurred during the commission of a robbery and that there was no evidence of deliberate premeditation. The defendants now contend that their exceptions to the charge were also broad enough to save their rights to the judge's alleged failure to charge the jury that a homicide which is considered to be murder solely because it was committed in the course of a breaking and entering can be found to be no more than murder in the second degree.

However liberally we read the colloquy which occurred between the judge and defence counsel after the charge, it cannot fairly be construed as bringing to the attention of the judge the fact that the defendants were objecting to his failure to charge the jury on second degree murder as related to the felony of breaking and entering. We defer further discussion of this issue to part 6 of this opinion.

So far as the charge related to first degree murder as a killing committed during robbery, the instructions were correct. There was evidence from which the jury could infer that the victim was possessed of money which was missing from his person when his body was discovered. From this and other evidence they could conclude that he was killed during a robbery. The Commonwealth argues that, aside from any evidence that money was taken from the person of the victim, the assault upon the victim, together with the evidence that property of the victim's

employer was stolen from the vending machines, is in itself evidence of a robbery. *Commonwealth* v. *Novicki,* 324 Mass. 461. *People* v. *Niemoth,* 409 Ill. 111. *State* v. *Butler,* 27 N. J. 560. We need not consider the validity of this reasoning in view of the fact that the judge charged exclusively with regard to robbery of money of the victim himself and we have determined that the evidence warranted such a charge. Further discussion is also unnecessary in view of the conclusions we have reached in part 6 of this opinion.

The evidence as to the precise cause of death, considered together with the admissions of the various defendants concerning what happened in the factory, was sufficient to warrant the charge upon deliberate premeditation, in view of the rule that a very short period of time will permit an inference of deliberate premeditation. *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 230, cert. den. sub. nom. *McLaughlin* v. *Massachusetts,* 389 U. S. 916.

2. Assignment of error 2 deals with the exclusion from evidence of a check offered by the defendant John Stokes through the witness Patricia Stoller, the aunt of the Stokes brothers. She testified that John Stokes had spent the weekend of January 18 and 19, 1969, at her home in Framingham. Counsel for John Stokes sought to enter in evidence the check of the witness dated January 18 and payable to John Stokes as some corroborating evidence of her testimony. The check was not offered as an assistance to present recollection revived or past recollection recorded, nor was it offered appropriately as an entry in the witness's regular course of business under G. L. c. 233, § 78. The witness was allowed to testify at length as to the events of the weekend in question, including her memory of the events related to the check. At best, the admissibility of the check rested in the sound discretion of the judge, and we find no abuse of that discretion.

3. Error is claimed in the judge's denial of motions to dismiss filed by the defendants John Stokes and James Stokes and alleging excessive delay (assignment 3). Prob-

able cause was found on July 8, 1969; indictments were returned on August 13, 1969; the defendants were arraigned on October 3, 1969; motions to dismiss were filed on October 23, 1969, and denied on February 25, 1970; and trial commenced on March 3, 1970.

There was no error. There was no evidence of oppressive or purposefully dilatory conduct by the prosecution, and the record reveals no harm or prejudice to the defendants caused by the two months' delay between indictment and arraignment or the nine months between arrest and trial. It is a fair inference that these delays were inherent in the general problems of the administration of justice in a congested county. *United States* v. *Ewell*, 383 U. S. 116. *Dickey* v. *Florida*, 398 U. S. 30. *United States* v. *DeLeo*, 422 F. 2d 487, 493–494 (1st Cir.), cert. den. sub nom. *DeLeo* v. *United States*, 397 U. S. 1037. *United States* v. *Frost*, 431 F. 2d 1249 (1st Cir.), cert. den. sub nom. *Frost* v. *United States*, 401 U. S. 916.

4. Assignment 4 claims error in the judge's denial of the defendants' motions for new trial. Neil McIsaac testified at the hearing on the motions that the witness introduced by the Commonwealth at the trial, Raymond DeMore, admitted to him that he had been at Pollak's and that a footprint the police had discovered was his. The granting of a motion for a new trial rests in the sound discretion of the judge. *Commonwealth* v. *Sacco*, 259 Mass. 128, 140. *Commonwealth* v. *Stout*, 356 Mass. 237, 242–243. Upon a review of McIsaac's equivocal testimony at the trial, as well as the examination and cross-examination of McIsaac at the hearing on the motions for new trial, no abuse of discretion is shown in the denial of the motions for new trial. There was ample evidence from which the judge was warranted in rejecting the testimony of McIsaac at the hearing on the motions. The defendants also fail in their further contention that a new trial is required because the Commonwealth allegedly suppressed exculpatory evidence in the form of the footprint referred to by McIsaac. The prosecution had knowledge of the existence of a foot-

print before the trial, and McIsaac could well have learned of its existence during his conversations with police during the investigation of the crimes. No evidence appears that the Commonwealth could relate the footprint to these crimes or to any person. It was not identifiable and thus not exculpatory of anyone.

5. Assignment 5 asserts error in the manner in which the jury's recommendation of clemency was received. Counsel for the Stokes brothers was present, and also representing Rego, when the jury reported verdicts of guilty of murder in the first degree. The jury were then excused from the court room. This attorney then stated that he would have no objection to the jury being recalled to the court room to permit the judge to inquire of the jury whether or not their verdict was murder in the first degree or murder in the first degree with a recommendation that the death sentence be not imposed. All counsel and the defendants were present when the judge explained to the jury that because of an apparent misunderstanding the jurors were not asked whether or not they had a recommendation nor did they volunteer the information until later when they were in a room adjoining the court room and some of them inquired of a court officer what the procedure was for making the recommendation. When polled, the jurors reported unanimously in favor of recommending that the death penalty be not imposed. The other defence attorney by this time was present and he stated that he had no objection to the manner in which the verdict was received. Because neither counsel objected at the time, because the entire matter was completed with a minimum of delay, and because recalling the jury inured to the benefit of the defendants, there was no error in the procedure.

6. We have noted in part 1 of this opinion that the defendants took no exceptions to what they now contend was an erroneous failure by the judge to instruct the jury that they would be warranted in returning verdicts of guilty of second degree murder if they found that the defendants killed the victim while engaged in the crime of breaking

and entering rather than robbery. Despite this failure to save exceptions, this court is required by G. L. c. 278, § 33E, to consider the whole case broadly to determine whether there was any miscarriage of justice.

We conclude that this omission in the charge to the jury requires us to give relief to the defendants here to insure against a miscarriage of justice. Except for this one omission the judge's instructions were lucid and comprehensive. The charge was necessarily lengthy in order to cover with clarity the many complexities in these cases. Considering the heavy burden that the charge and other concurrent duties put upon the judge at that difficult juncture in the trial, the onus is clearly upon counsel, particularly defence counsel, for their failure to bring to the attention of the judge what may well have been an unintentional omission in the instructions. Nevertheless, the defendants here are entitled to our assistance under G. L. c. 278, § 33E.

The charge to the jury permitted them to return verdicts of guilty of first degree murder upon grounds of deliberately premeditated malice aforethought, or extreme atrocity and cruelty, or upon the conclusion that the defendants were participating in a robbery of the victim when they killed him. G. L. c. 265, § 1. They were fully and appropriately instructed concerning the criminal responsibility as principals of each and all of the defendants for any homicide committed in the course of any common criminal endeavor in which all participated. *Commonwealth* v. *Devereaux,* 256 Mass. 387, 394-396.

Verdicts of guilty of second degree murder were submitted to the jury as permissible. There were no instructions which related the crime of breaking and entering to the possible verdict of guilty of murder in the second degree. The only portion of the charge which disclosed to the jury any reasoning subsidiary to second degree murder consisted in the reading of the murder statute, G. L. c. 265, § 1. The judge instructed the jury: "Murder which does not appear to be in the first degree is murder in the second degree and it is for the jury to determine whether it is murder in the

first degree or murder in the second degree." The crime of breaking and entering was defined and discussed in the charge but only in connection with the breaking and entering indictments and not with regard to the murder indictments.

A homicide committed in the commission or attempted commission of a felony is murder at common law. *Commonwealth* v. *Chance,* 174 Mass. 245, 252–253. *Commonwealth* v. *Madeiros,* 255 Mass. 304, 315. *Commonwealth* v. *Green,* 302 Mass. 547, 556. *Commonwealth* v. *White,* 353 Mass. 409, 424, cert. den. sub nom. *White* v. *Massachusetts,* 391 U. S. 968. Only by reason of G. L. c. 265, § 1, does murder perpetrated in the commission or attempted commission of a crime punishable by death or imprisonment for life (e.g. robbery, rape) become murder in the first degree. We appreciate that the first degree murder verdicts here may well have been based not upon robbery but upon a finding of deliberate premeditation, or a finding of extreme cruelty or atrocity, or both considerations. However, that is not controlling. The determinant here is that the evidence warranted an inference that the defendants killed the victim while they were committing the crime of breaking and entering. Therefore, a full and appropriate charge to the jury should have included in substance the instructions that, absent deliberate premeditation or extreme cruelty or atrocity, a jury conclusion that the killing occurred during the crime of breaking and entering rather than robbery would warrant guilty verdicts of no more than murder in the second degree. No such instructions were given.

In the case of *Commonwealth* v. *White,* 353 Mass. 409, the victim was found shot to death about 6:30 A.M. outside his place of business. The defendant wrote a note which contained the address of the site of the homicide and also contained an itemized list of burglar's tools. The defendant was shown to have said on one occasion that he went to rob the place and on another occasion that he went to break and enter. The judge properly charged that the evidence would permit the jury to find that the killing occurred either during an attempted robbery or during an attempted break-

ing and entering into the nearby building. He also charged correctly that a first degree murder conviction would be warranted upon a finding of robbery but no more than a second degree murder conviction could be sustained upon a finding of breaking and entering. The jury returned a verdict of guilty of first degree murder. Since the charge failed to define the crimes of robbery and breaking and entering, this court, in the exercise of its power under G. L. c. 278, § 33E, remanded the case to the Superior Court for the entry of a verdict of guilty of murder in the second degree.

The circumstance that the jury here returned guilty verdicts against all three defendants upon the breaking and entering indictments is consistent with our reasoning but of course not conclusive. The evidence warranted findings that the defendants were engaged simultaneously in the crimes of both robbery and breaking and entering. Nor was the Commonwealth required to present indictments for robbery in order to permit the argument as to the murder indictments that the homicide occurred during a robbery. However, as in the *White* case, there was substantial evidence here from which the jury could have concluded that the killing occurred during a breaking and entering. The jury were entitled to disbelieve that the victim had received a sum of money from his wife, or they could have permissibly found that any money taken from the victim was stolen after he was killed and that he was not killed for that purpose. They could have inferred that the defendants were engaged in a surreptitious crime and did not expect a confrontation with anyone at the factory at that time of night.

Since we have determined that we shall affirmatively exercise our power under G. L. c. 278, § 33E, we have the alternatives of awarding the defendants a new trial or ordering the entry of verdicts of guilty of second degree murder. If we were to award a new trial it would be to decide only whether the defendants are guilty of first degree murder or second degree murder, since the verdicts estab-

lished that the defendants are guilty of murder. We conclude that justice will be best served if guilty verdicts of second degree murder are now entered.

The cases are remanded to the Superior Court for the entry of verdicts of guilty of murder in the second degree as to all three defendants and for the imposition of sentences. The judgments are affirmed as to all three defendants upon the indictments for breaking and entering in the nighttime.

*So ordered.*