## Commonwealth *vs*. Thomas R. Glowacki.

Berkshire.    September 10, 1986. — November 3, 1986.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & O'Connor, JJ.

*Search and Seizure,* Expectation of privacy. *Evidence,* Photograph. *Homicide. Practice, Criminal,* Instructions to jury. *Felony-Murder Rule. Robbery. Larceny.*

A defendant charged with murder, who had lived in the victim's house until approximately one month before the occurrence of the homicide and a subsequent search of the premises by police, had no such reasonable expectation of privacy in the house as would entitle him to challenge the constitutionality of the search. [512]

At a murder trial the judge acted within the scope of his discretion in determining that the probative value of certain photographs of the victim's body outweighed any potential the photographs might have had for prejudicial effect. [512]

With respect to a defendant found guilty of first degree murder on the theory of felony-murder, with unarmed robbery as the underlying felony, there was no substantial risk of a miscarriage of justice in the judge's failure to instruct the jury on the lesser included offense of larceny from the person as the underlying felony, which would have permitted a verdict of felony-murder in the second degree, where all of the evidence indicated a violent confrontation between the defendant and the victim, who had been stabbed after a severe beating, and where no construction of the facts would have warranted such an instruction. [513-514]

Indictments found and returned in the Superior Court Department on November 7, 1984.

A pretrial motion to suppress evidence was heard by *William W. Simons,* J., and the cases were tried before *John F. Murphy, Jr.,* J.

*Imelda C. LaMountain* for the defendant.

*Daniel A. Ford,* Assistant District Attorney, for the Commonwealth.

Hennessey, C.J. The defendant was found guilty of murder in the first degree, unarmed robbery, breaking and entering in

the nighttime with intent to commit a felony, and larceny in a building. He now asserts error in the denial of his motion to suppress evidence found at the scene of the murder; in the admission in evidence of photographs of the victim; and in the judge's failure to instruct the jury on the lesser included offense of larceny from the person in connection with the indictment charging unarmed robbery and the Commonwealth's theory of felony-murder. He also argues that this court should exercise its special power under G. L. c. 278, § 33E (1984 ed.), by reducing the conviction of murder in the first degree to murder in the second degree or manslaughter. We conclude that there was no error. We also conclude that we shall not grant the relief requested under § 33E. We affirm.

All five indictments arose out of a single incident which occurred in Sheffield on September 25, 1984. The evidence may be summarized as follows. The victim, John W. Bennetton, was an antique dealer who lived next to his antique shop in Sheffield. Behind the antique shop, farther away from the highway, was a mobile home which Bennetton rented to a young couple, Laurie Griffin and Richard Robarge. The defendant lived in the Bennetton home "for a while," and was seen by Griffin mowing Bennetton's lawn or working on the house being built next door.

Approximately one month before Bennetton's death, Robarge and Griffin invited the defendant to go with them to a party at Bennetton's request. The defendant became intoxicated at the party, and on the way home said that Bennetton was a "faggot" and had made sexual advances toward him. He went on to say, "I'm going to kill that guy. Don't be surprised if you come here and find him dead. . . . Some morning you'll wake up and you won't be able to find Jack and you'll know I killed him." Shortly thereafter, the defendant moved out of Bennetton's home approximately two weeks before the homicide.[1] Two days before the homicide, another

[1] At the hearing on the defendant's motion to suppress, Rosa Cavalier, the owner of a rooming house called the Sheffield House, testified that the defendant left Bennetton's home and rented a room from her in early September, 1984. The murder occurred on September 25, 1984.

witness testified, the defendant stated that Bennetton had "kicked him out of the house" and had sent him to jail. He went on to say, "I'm going to get that son-of-a-bitch. I'm going to kill him."

On the afternoon of September 25, 1984, the defendant, his cousins Richard and Mark Glowacki, one Kevin Campbell, and one Denise Costa[2] set out from Enfield, Connecticut, for Sheffield. The defendant stated that someone owed him "a lot of money" and that he was going to Sheffield to collect it. They went first to the Sheffield House, where the defendant told Denise to stay, "[i]n case there was a fight or something." Before leaving the Sheffield House, the defendant told another resident, one Leigh Whitney, that they were going to get some beer and some money "and that he might have a little trouble getting the money." He asked Whitney to go with them, but Whitney declined. Between 8 and 8:30 P.M., the defendant and his three companions went to the Sheffield Package Store, where Laurie Griffin was working. She sold the defendant a single quart of beer, which she put into a brown "liquor" bag. She noticed that the defendant seemed to be "in a hurry" and that he was not intoxicated. The four men drove off toward the Bennetton house.

At approximately 9:10 P.M., Robarge returned to the trailer behind the Bennetton house. As he drove into the driveway, he noticed that the lights in the antique shop were suddenly turned off, and then he saw the defendant and the others loading things into Bennetton's station wagon. The defendant told Robarge that he was moving some antiques to New York for Bennetton. The defendant yelled toward the antique shop, "Okay, guys, it's cool"; at that point, the lights came back on. Robarge then observed two men get into Costa's vehicle, and the defendant and another man get into Bennetton's station wagon. Both cars then sped away. Robarge also noticed that the defendant appeared "kind of wary, kind of nervous."

[2] Mark and Richard are brothers. The defendant, Thomas Glowacki, is their first cousin. Mark Glowacki, Richard Glowacki, Kevin Campbell, and Denise Costa all lived in Enfield, Connecticut.

Robarge became suspicious when he saw that they had left the antique shop unlocked. Bennetton failed to respond when Robarge called his name, rang the doorbell, and telephoned; he then telephoned the Sheffield police.

Shortly thereafter, Officer Robert Ulrich arrived, and found the antique shop in disarray. Bennetton did not respond when Officer Ulrich called his name, and the door was locked. Officer Ulrich found a ladder, and he and Robarge entered the Bennetton home through a second-floor porch above the garage. The porch was "a general mess" with papers and broken glass on the floor, and the telephone was off the hook. Robarge noticed that a number of items were missing from the antique shop and the house, including a television set and a video cassette recorder. Officer Ulrich then entered the living room, which was also in disarray, with the curtains drawn and the wires cut. A trail of blood led up a set of stairs to a third-floor bedroom, where the officer found Bennetton's body lying in a pool of blood with a pillow over his head.

A pathologist, Dr. Jeffrey S. Ross, testified that Bennetton had been severely battered about the head, neck, and chest, and had been stabbed twice, once on each side of the neck. Dr. Ross was of the opinion that Bennetton was alive when the stab wounds were inflicted, and that Bennetton bled to death.[3] Finally, Dr. Ross testified that, apart from the stabbing, Bennetton's injuries were severe enough to create a substantial risk of death.

After they left the Bennetton home, the defendant and his three companions returned to the Sheffield House. Leigh Whitney watched the defendant divide a large sum of money among

---

[3] The doctor was shown a switchblade knife recovered by the police, and agreed that the appearance of the two stab wounds was consistent with their having been inflicted by that knife. Dr. Ross detailed Bennetton's injuries, which included three fractured ribs and a large gash on the back of the head caused by some blunt object, such as a beer bottle. On the porch in the Bennetton home, the police found a broken quart bottle of beer, with its neck still inside a brown paper "liquor" bag. On the paper bag, a State chemist found group A human blood, the same blood type as Bennetton's. On the pieces of broken beer bottle, the chemist found hairs whose appearance was consistent with Bennetton's.

the members of the group. The defendant told Whitney that he had gone to the antique shop, and had "done a guy in." He even showed Whitney the switchblade knife he had used, and said that he had slit the man's throat as the man was reaching for the telephone. He also said that he had grabbed the man's hair and smashed "his face into [my] knee." According to Whitney, the defendant seemed cool and calm, and said he was going to Florida to have a good time until he got caught. He also told Whitney that he had to do most of the work, and that his "little cousins were worth . . . ." Finally, the defendant commented to Whitney that he had to go back to the scene and "do in the guy who lived out back" (Robarge) because he was afraid Robarge would "rat them out."

At approximately 3:30 A.M. on September 26, the defendant was arrested by the Connecticut State police near Hartford where he was seen driving the Bennetton vehicle. The police transported the defendant to the Hartford barracks, where he was given his Miranda warnings. He waived his rights and spoke to Trooper Ronald Ruel. The conversation continued for several hours, and amounted to a full and complete admission of guilt.[4] The defendant acknowledged that he knew Bennetton, and that Bennetton owed him money for work he had done. He said that three or four months earlier he had heard some talk that Bennetton was "gay," prompting him to move out of Bennetton's home and into the Sheffield House. He went on to say, "It's all my fault, I beat him. I beat him bad. They're going to fry me for this." He stated that he went to Bennetton's home that night because Bennetton owed him some money, and because he wanted to "settle the score" with Bennetton, whom he believed had "dropped a dime" on him, leading to his arrest on an escape charge. He brought the others along "as backup," and because he would have "less of a problem with [Bennetton] with all these people present." Upon entering the house, he stated, he and Bennetton began to argue, and he hit Bennetton with a beer bottle. From there, it was

---

[4] The defendant filed a pretrial motion to suppress his statements, which was denied. He has claimed no appeal from that ruling.

"like a gang bang," with everyone beating and kicking Bennetton repeatedly. Bennetton tried to cover his face with his hands "but we kicked his . . . head in. He was a . . . mess." They carried Bennetton upstairs, and looked around for a rifle to "finish him off." When he realized there was no ammunition, he took out his knife and stabbed Bennetton in the neck. When asked why he stabbed him, he replied, "We knew he was going to die anyway, he was roughed up bad, I decided to put him out of his misery." He rolled Bennetton's body over to get the wallet, took all the cash out of it, and then proceeded to "rip off" the house and the antique shop.

1. The defendant's first contention on appeal is that the motion judge erred in denying his motion to suppress the evidence seized in the warrantless search of the victim's house. The defendant had the burden of establishing that he had a reasonable expectation of privacy in the victim's house before he could properly assert that the search was illegal and the evidence should be suppressed. *Smith* v. *Maryland,* 442 U.S. 735, 740 (1979). *Commonwealth* v. *D'Onofrio,* 396 Mass. 711, 714-715 (1986). The judge found, on evidence which warranted that conclusion, that the defendant lived in a rooming house approximately two miles from the victim's house. The judge correctly ruled that the defendant had no basis to challenge the constitutionality of the search of the victim's house, and properly denied the defendant's motion to suppress.

2. The defendant claims that the trial judge erred in admitting in evidence photographs of the victim. The admissibility of photographic evidence is a matter left to the sound discretion of the judge, and the defendant bears a heavy burden of demonstrating an abuse of that discretion. *Commonwealth* v. *Medeiros,* 395 Mass. 336, 351 (1985). *Commonwealth* v. *Bys,* 370 Mass. 350, 361 (1976). The judge examined each photograph, excluding several taken during the autopsy and those which were repetitious. Those photographs admitted were clearly "relevant to extreme atrocity or premeditation, both of which were in issue." *Commonwealth* v. *Sielicki,* 391 Mass. 377, 382 (1984). We have examined the photographs and conclude that the judge was warranted in deciding that their probative value outweighed any prejudicial effect.

3. The judge instructed the jury on murder in the first degree on the theories of premeditation, extreme atrocity, and felony-murder. The jury indicated upon a verdict slip that they based their verdict of guilty of murder in the first degree on felony-murder. The principle of felony-murder had its origin in the common law. *Commonwealth* v. *White,* 353 Mass. 409, 424 (1967), cert. denied, 391 U.S. 968 (1968). *Commonwealth* v. *Green,* 302 Mass. 547, 556 (1939). *Commonwealth* v. *Madeiros,* 255 Mass. 304, 315 (1926). *Commonwealth* v. *Chance,* 174 Mass. 245, 252-253 (1899). Only by reason of G. L. c. 265, § 1 (1984 ed.), does murder perpetrated in the commission or attempted commission of a crime punishable by death or imprisonment for life (e.g., robbery, rape) become murder in the first degree. The defendant was convicted of first degree felony-murder, based upon unarmed robbery, which was the only underlying felony to which the judge referred in his instruction.

The defendant argues that the judge erred in declining to instruct the jury on larceny from the person. The defendant reasons that the jury might have found that the defendant committed, not unarmed robbery, but the lesser included offense of larceny from the person. Because larceny from the person is not punishable by death or imprisonment for life, a felony-murder conviction in which larceny from the person was the underlying felony could only warrant a conviction of murder in the second degree. See *Commonwealth* v. *White, supra* at 424.[5]

Although the defendant argues otherwise, we think it is clear from the record that the defense did not assert an objection to the judge's instructions. Thus, the proper standard for review is whether the jury charge "was so erroneous that it created a 'substantial risk of a miscarriage of justice.'" *Commonwealth*

---

[5] The principles relating to jury instructions in felony-murder cases, as discussed in *Commonwealth* v. *Matchett,* 386 Mass. 492, 508 (1982), were not raised by the defendant at trial or on appeal. In the circumstances of this case, an argument that the omission of jury instructions based upon *Matchett* principles presented a substantial risk of a miscarriage of justice would not be successful.

v. *Murray,* 396 Mass. 702, 705 (1986). Even if the defendant had made a timely objection, there was no error in the judge's instructions to the jury, much less a substantial risk of a miscarriage of justice.

No construction of the facts in this case would warrant an instruction to the jury on felony-murder with larceny from the person as the underlying felony. The judge properly instructed the jury as to felony-murder as it related to unarmed robbery, and the judge also instructed the jury on voluntary manslaughter. The evidence supported the jury's finding that the defendant committed unarmed robbery, and killed the victim in the course of that felony. Alternatively, we assume without deciding, the jury might have found, as defense counsel urged them, that the defendant confronted Bennetton with no criminal intent at all, that the killing occurred in the course of an argument that broke out between the defendant and the victim, that the stealing was merely an afterthought, and that on this reasoning the jury would have been warranted in returning a manslaughter verdict.

Under no construction of the facts could the jury have found that the defendant killed the victim in the course of larceny from the person, supporting a second degree felony-murder conviction. The fundamental distinction between unarmed robbery and the lesser included offense of larceny from the person is the use or threat of force. *Commonwealth* v. *Jones,* 362 Mass. 83, 86 (1972). All the evidence in this case indicates a confrontation and force, including the defendant's own statements that he took along three others as "backup" and that "he might have a little trouble getting the money." The facts cannot support a finding that the killing occurred in the course of larceny from the person, because force or the threat of force permeated the encounter, and the victim was indeed beaten and stabbed before the defendant stole any property. The judge properly instructed the jury on first degree felony-murder. A charge on felony-murder with larceny from the person as the underlying felony was not warranted.

This case is unlike *Commonwealth* v. *Rego,* 360 Mass. 385, 395-396 (1971), in which this court reduced the defendants' convictions to murder in the second degree because of the

judge's failure to instruct the jury on felony-murder based on breaking and entering rather than robbery. In *Rego,* the defendants had broken into a factory to steal money from the vending machines. *Id.* at 396. They were surprised by a security guard, whom they killed. There was evidence that the defendants had stolen money from the person of the guard, although they were tried only for murder and for breaking and entering. In support of its charge of murder in the first degree, the Commonwealth argued that robbery supported a verdict of first degree murder on the theory of felony-murder. *Id.* at 390. The judge failed to instruct the jury that if the murder had been committed in the course of breaking and entering, rather than robbery, then a verdict of only murder in the second degree would be warranted. *Id.* at 395. This court concluded that there was evidence from which the jury could have decided that the killing occurred during a breaking and entering. *Id.* at 396. Exercising its power under G. L. c. 278, § 33E, this court ordered the verdicts reduced to murder in the second degree. *Id.* at 396-397. In *Rego,* the jury could warrantably have concluded that the defendants went to the factory expecting it to be unoccupied, and were surprised by the security guard. In this case, there is overwhelming and uncontroverted evidence that the defendant expected the victim to be home, and in fact went there to confront him.

4. The defendant asks this court to exercise its broad power of review under § 33E to grant a new trial or reduce the verdict to murder in the second degree. While we note that the defendant was twenty-two years old and had an unfortunate family history; there is also evidence in the record of prior serious crimes of violence. Having reviewed the whole case on the law and the evidence, we find no occasion to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the degree of guilt.

*Judgments affirmed.*