COMMONWEALTH *vs.* BRIAN K. MATCHETT.

Berkshire.   October 6, 1981. — June 14, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide.   Extortion.   Felony-Murder Rule.   Search and Seizure,* Auto-
mobile.  *Constitutional Law,* Search and seizure.

Evidence at the trial of an indictment for murder, in which the Common-
wealth had proceeded in part on the theory of felony-murder, was suf-
ficient to permit the jury to infer that the defendant and a companion
were engaged in a joint enterprise to extort money from the victim and
that either or both of them uttered threats to the victim in the course
of the joint enterprise which ended in the shooting of the victim.
[499-501]

Discussion of the origin and scope of the felony-murder rule.  [502-508]

Instructions permitting a jury to find a criminal defendant guilty of mur-
der in the second degree on the basis of the felony-murder rule, if they
found that the shooting of the victim had occurred in the perpetration
or attempted perpetration of the statutory felony of extortion, consti-
tuted error requiring reversal of the defendant's conviction, where the
jury were not also instructed that, to convict the defendant on this
theory, they must find that the circumstances of the extortion demon-
strated the defendant's conscious disregard of the risk to human life.
[508] NOLAN J. dissenting.

A motion to suppress evidence obtained by police as the result of a war-
rantless search of a criminal defendant's impounded automobile was
properly denied, where the judge concluded on sufficient oral testi-
mony that the search had been for the purpose of making an inventory
of the contents of the automobile pursuant to established police pro-
cedures and was not a mere pretext concealing an investigatory
motive.  [508-511]

INDICTMENTS found and returned in the Superior Court
Department on March 6, 1979.

The cases were tried before *Moriarty,* J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*Andrew Good* for the defendant.

*Daniel A. Ford,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. Brian K. Matchett, indicted on a charge of murder in the first degree of David T. Colvin, was convicted by a jury of murder in the second degree. Matchett was also convicted on indictments charging him with unlawfully carrying a sawed-off shotgun, a .25 caliber semiautomatic pistol, and a .38 caliber revolver. G. L. c. 269, § 10. The defendant was sentenced to life imprisonment on the conviction for murder and was given concurrent sentences of three to five years for two of the firearms convictions and five to seven years on the sawed-off shotgun conviction. The defendant appealed, and this court ordered, on our own motion, that the appeal be transferred for direct appellate review.[1]

Matchett challenges his convictions, claiming that the trial judge erred in (1) instructing the jury that a verdict of murder in the second degree was permissible by application of the felony-murder doctrine; and (2) denying his motion to suppress evidence seized through a warrantless inventory search of his car. We conclude that the firearms convictions should be affirmed and that the murder conviction should be reversed.

We summarize the evidence. In the fall of 1977, the victim in this case, David Colvin, lost $1,500 in a poker game to Arthur Samson.[2] The gambling debt remained unpaid as of February 12, 1979. On that evening Matchett and Samson had dinner with mutual friends in a Boston restaurant. Although they were only slightly acquainted, Samson had heard that Matchett was a war hero, an "expert" in the martial arts, and had a permit to carry guns. At this time, Matchett was employed as a contract courier, delivering various parcels throughout Massachusetts.

---

[1] The offense resulting in the defendant's murder conviction was committed before July 1, 1979. See *Commonwealth* v. *Davis*, 380 Mass. 1, 12, 15 (1980).

[2] Samson, a codefendant in this case, was acquitted of all charges by the jury.

Samson testified that, over dinner, he agreed to hire Matchett for $100, plus expenses, to drive him from Boston to Pittsfield later that night. The purpose of the trip was to collect the gambling debt from Colvin. A few weeks prior to February 12, 1979, Colvin had told Samson that he was getting some money together and to come up in a couple of weeks to be paid. No specific date, however, was set for this meeting.

At approximately 9:30 P.M., Samson and Matchett left Boston for Pittsfield in Matchett's station wagon. Matchett's German shepherd dog was in the rear of the wagon. Matchett admitted bringing two guns with him, a revolver which he said he always carried for protection of personal property and a pistol which he was trying to sell. The two men arrived in Pittsfield at approximately 1 A.M. on February 13 and checked into a room, under Samson's name, at the Holiday Inn. Shortly after arrival, Samson called the Pittsfield fire department to obtain directions to the Colvin house. Samson also called the Colvin residence, asked for David, and was told by Ralph Colvin, the victim's father, that David was not home.[3]

Matchett and Samson then drove from the Holiday Inn to Colvin's neighborhood and tried to locate the house. Matchett testified that he knocked on various doors in an attempt to locate the Colvin house so that the pair would know the exact location the following day. Ralph Colvin testified that around 3:30 A.M. he was awakened by a station wagon which pulled into his driveway. A man, whom Ralph Colvin identified in court as Matchett, came to the door and stated that he was an airline courier looking for 196 Hungerford Street.[4] When Ralph Colvin informed him that there was no such address, Matchett apologized for getting him up and stated that he needed better directions. Ralph Colvin further testified that at 4:30 A.M. he received a tele-

---

[3] David Colvin was at home, but this was unknown to Ralph Colvin at. the time.

[4] The Colvin residence was located at 194 Hungerford Street.

phone call by someone asking for David, and again stated that David was not at home. That morning Ralph Colvin told David about the telephone calls and testified that David looked "up tight" and "nervous."

At approximately 7 A.M., February 13, 1979, Matchett and Samson arrived at the residence and store of Charles Coppola, an acquaintance of Samson, and asked for Coppola's assistance in locating David Colvin. Coppola called David's brother and explained the problem. Within five minutes David called Coppola and then spoke with Samson. Although the testimony varies somewhat at this point, as to whether Matchett and Samson were still unable to locate Colvin's house, or whether they went there and David was not at home, the pair returned to Coppola's store. According to Coppola, he again called Colvin's house and David told Coppola that he was waiting by his window for Samson and Matchett and that the pair must have gone to the wrong house. Samson testified that on returning to Coppola's store he used a pay phone outside the store and called David again to get better directions.

Brian Stack testified that he lived directly across the street from the Colvins. At approximately 8:20 A.M. on February 13, Stack met David Colvin outside his house, and Colvin asked him to keep his "eyes and ears open." Shortly thereafter Stack called Colvin and said he had work to do around the house but that Colvin should call him if he had any trouble. At approximately 8:45 A.M. Colvin again called Stack. After this call, Stack looked out his window and saw a station wagon occupied by Matchett, Samson, and the dog pull into the Colvin driveway. The car was driven to the top of the driveway and turned around to face the street. Stack testified that Samson alighted from the car, shook hands with David Colvin while on the porch, and entered the house. Less than a minute later, Matchett got out of the car, looked up and down the street a few times, and entered the house. At this point, Stack pulled his wife's car in front of the Colvin driveway, opened its hood, and pretended to be having car trouble in order to "block off any escape in

case there was any trouble." Stack testified that, as he started back across the street, he heard Colvin scream and then heard two shots, a second or two apart, coming from inside the Colvin house. Stack went into his house and made two telephone calls: one was to Colvin's brother at his place of work to report the "trouble"; the second call was to the Colvin house. David Colvin answered the telephone call to the house and whispered, "Brian." Stack then looked out the window and saw Samson and Matchett leaving the Colvin house. According to Stack, the station wagon slammed into his wife's car several times, left the driveway, and headed toward Route 20. Stack then entered the Colvin house and found David lying on the floor of the living room bleeding from the shoulder. Stack then called the police.

Both defendants testified as to what occurred on their arrival at the Colvin residence. Matchett testified that shortly after Samson and Colvin shook hands and entered the house, he got out of his car and was just standing looking around when he heard "loud yells" coming from within the house. Matchett then went into the house armed with his two handguns, one in his right hand jacket pocket and one in his left pants pocket. Matchett entered by the front door and went into the living room where Colvin was sitting in a chair next to a table with a lamp on it. Matchett said, "Hi," to Colvin. There was no reply. After about ten seconds, Colvin said to Matchett, "How would you like this lamp broken over your head?" Colvin jumped up in front of Matchett. Matchett started to draw his handgun out of his right jacket pocket, yelling, "Hold it," at the same time. Matchett testified that Colvin swung his left arm into Matchett's right hand. At or about the time Matchett was cocking the trigger, "[h]e whipped my arm up, and a round discharged and entered his left shoulder." Matchett testified that the second round must have discharged simultaneously with the first, as he was not aware of it.

According to the testimony of the defendants, Samson left the house quickly and noticed the Stack car was blocking

the driveway. Samson made an effort to shift the gears of the Stack car in order to move it. Matchett testified that, after looking at the car in the driveway, he returned inside the house and asked Colvin, "Why"? Colvin replied, "I'm shot, Man. It doesn't matter, I want to die anyways."[5] Matchett then left the house, drove his car down the driveway adjacent to the Stack car, got out of his car and "moved [the Stack car] in bounces, and slid it approximately three feet to the right." Samson and Matchett then got into Matchett's car and left the driveway, slightly brushing the front fender of the Stack car as they passed.

One of the first officials at the scene was a lieutenant in the Pittsfield fire department. Along with several other firefighters and police officers, he carried Colvin out of the house and into the ambulance. He testified that Colvin told him he had been shot with a .38 caliber hollow point bullet. A police officer at the scene testified that he removed a bullet from the wall of the Colvin living room, located twenty-five and three-quarters inches from the floor.

Two days after the shooting David Colvin died of a gunshot wound to the abdomen.[6] Measurement of the body at the time of death revealed that David Colvin was approximately six feet, four inches tall. His estimated weight was well over 300 pounds.

The trial judge instructed the jury that the defendant could be found guilty of murder in the first or second degree. The judge told the jury that murder in the first degree could be found based on deliberately premeditated malice aforethought or the felony-murder rule, with the underlying felony being an armed assault in a dwelling house with intent to commit a felony. See G. L. c. 265,

[5] Although Matchett testified that at this time Colvin was seated on a sofa, holding his shoulder, all other witnesses who subsequently arrived at the scene testified that Colvin was found on the floor.

[6] The autopsy disclosed a gunshot wound to the shoulder through which the bullet had passed completely. Apparently that was the bullet which was found in the wall, twenty-five and three-quarters inches from the floor.

§§ 1, 18A. A verdict of murder in the second degree could be returned if the defendant acted with express malice aforethought, i.e., an intention to kill without excuse or mitigation, or with implied malice aforethought, the implication arising from the underlying felony of extortion.[7] G. L. c. 265, § 25.

The defendant claims a number of errors in the judge's instruction concerning the felony-murder doctrine. First, the defendant argues that the record is devoid of any evidence of an attempted extortion, and hence any charge based on such an attempt was improper.[8] Second, the defendant

[7] The defendant Matchett was charged neither with armed assault in a dwelling house, nor with attempted extortion.

[8] The defendant also claims that the trial judge refused to instruct the jury that a required element of the crime of attempted extortion is the utterance of a "threat." We find no merit in this argument, as the record shows that the judge did instruct the jury that "[o]ne definition of extortion is as follows: Whoever by a verbal or written or printed communication maliciously threatens an injury to a person or property of another with intent thereby to extort money, or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished. This is the crime of extortion." The judge was not required to repeat his instruction, to give undue emphasis to any particular part, or to instruct the jury in the exact language requested by the defendant. See *Commonwealth* v. *Chasson*, 383 Mass. 183, 188 (1981); *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978); *Commonwealth* v. *Edmonds*, 365 Mass. 496, 506 (1974); *Commonwealth* v. *Roberts*, 5 Mass. App. Ct. 881, 882 (1977). The defendant's argument in this regard is similar to the contention that there was no evidence from which the jury could have found that the defendant engaged in the act of extortion or attempted extortion as defined in G. L. c. 265, § 25.

We note also that, although the defendant filed a motion for required findings of not guilty as to the murder indictment, he does not argue on appeal the propriety of the denial of these motions.

Since the crime of extortion or attempted extortion was not charged, the defendant obviously could not raise the question of the sufficiency of the evidence as to extortion by a motion for a required finding. However, we treat the question whether there was sufficient evidence to warrant submission of the issue of felony-murder to the jury on a theory of extortion under a similar standard; namely, "whether there was sufficient evidence of the defendant's guilt to warrant the submission of the [case] to a jury." *Commonwealth* v. *Baker*, 368 Mass. 58, 81 (1975), quoting from *Commonwealth* v. *Altenhaus*, 317 Mass. 270, 271 (1944). Cf. *Commonwealth* v. *Robinson*, 382 Mass. 189, 197 (1981) (evidence "sufficient to warrant" an instruction).

contends that the common law felony-murder rule is inapplicable to the statutory crime of extortion. And, third, the defendant argues that the felony-murder rule is, per se, unconstitutional.

We consider only the first and second grounds on which the defendant seeks relief from this court.

1. *Sufficiency of the evidence to raise the extortion issue.* In order to prove murder in the second degree, one of the theories that the Commonwealth proceeded on was the felony-murder doctrine. To prove the underlying felony, attempted extortion, the Commonwealth was required to prove, inter alia, that one or both of the defendants maliciously uttered an oral or written threat of personal injury or property damage to Colvin with the intent to extort money from him. See G. L. c. 265, § 25; *Commonwealth v. DeVincent,* 358 Mass. 592, 595 (1971) (restating essential elements of extortion). The defendant contends that since there was no eyewitness account of what took place in the Colvin residence, save both defendants' testimony, there could be no inference drawn that extortionate threats were uttered and, hence, the evidence was insufficient to invoke the felony-murder rule. We disagree.

Defense counsel argues that the jury instructions were based on nonverbal activities of the defendants.[9] It is true that conviction for attempted extortion cannot be based on the nonverbal communication of a threat of bodily harm. *Robinson v. Commonwealth,* 101 Mass. 27, 28 (1869). The Commonwealth, however, contends that there was an abundance of evidence from which the jury could have inferred that Matchett and Samson were involved in a joint venture to commit extortion, and that either or both of them

---

[9] In response to defense arguments that there was no evidence of the utterance of an extortionate threat, the trial judge asked, "You don't think the jury can infer the threat on the fact Mr. Samson arrived at three thirty in the morning, trying to find this fellow and collect, he said a gambling debt, brings with him a fellow carrying two guns and a knife. You don't think the jury can reasonably infer that there was some threat involved?" Defense counsel responded in the negative.

uttered malicious threats to Colvin in the course of that joint enterprise before the shooting, which was the end result of the attempted extortion. This court has upheld convictions where the only proof of an essential element of the crime came through inferences. See, e.g., *Commonwealth* v. *McGrath*, 358 Mass. 314 (1970) (underlying felony of robbery in first degree murder case inferred from facts proved).

We are mindful that "if, upon all the evidence, the question of the guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand." *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940). It is, however, equally well established that where there is enough evidence to satisfy a rational trier of fact that the inference may be drawn, there is no error. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). We believe the jury could have found adequate evidence of malicious threats based on the following facts: Colvin owed Samson $1,500 for more than one year,[10] and the trip to Pittsfield was for the sole purpose of collecting that debt. Samson, who was perfectly capable of driving himself to Pittsfield, hired Matchett, who Samson knew carried guns and was a martial arts expert, as a "driver." Matchett brought with him a veritable arsenal of weapons, consisting of a loaded pistol and a revolver, ammunition, a sawed-off shotgun, a large dog, a pair of handcuffs, and a knife. The pair set out at 1:30 A.M. and stayed out until approximately 4 A.M. looking for the Colvin house. Based on this activity, the jury could reasonably infer that upon finding David Colvin, or in the telephone conversation preceding their meeting, one or both of the defendants maliciously threatened Colvin in order to collect the money, again, the sole purpose of the trip.

Although it is neither necessary nor sufficient to show that an extortion victim was in fear of the defendant, *Com-*

---

[10] It is well settled that even a just debt can be the subject of an extortion. *Commonwealth* v. *DeVincent*, 358 Mass. 592, 595 (1971). A gambling debt is, of course, illegal and unenforceable. See G. L. c. 137, § 3.

monwealth v. *Corcoran*, 252 Mass. 465, 482-484 (1925),
fear felt by the victim is highly relevant. *Commonwealth* v.
*Winter*, 9 Mass. App. Ct. 512, 528 (1980). At some point
after Colvin knew that Matchett and Samson were on their
way to his house, he asked his neighbor to "keep [his] eyes
and ears open," an indication that Colvin expected trouble.

Finally, the Commonwealth presented evidence that Col-
vin told a fireman, shortly after the shooting, that he had
been shot by hollow point bullets. Although the statement
was not offered for the truth of the matter asserted, the jury
could have inferred that one or both of the defendants
threatened Colvin with injury by hollow point bullets if he
failed to pay the debt.

On all of the evidence presented, we cannot say that the
jury was allowed to speculate as to whether the defendants
said anything to Colvin concerning violence. From the evi-
dence we have recounted, the jury could draw a reasonable
inference that some time prior to the shooting, one or both
of the defendants threatened Colvin with physical harm if
he failed to pay the gambling debt. Cf. *Commonwealth* v.
*Latimore, supra* at 678. In this light, we find no error in
the judge's conclusion that the evidence was sufficient to
put the question of attempted extortion to the jury. But this
does not end our inquiry. We turn next to the question
whether the charge on felony-murder in the second degree
was proper.

2. *Application of the felony-murder rule.* At the close of
all the evidence, the judge instructed the jury with respect
to murder, including felony-murder in the first and second
degree (G. L. c. 265, § 1). The instruction concerning fel-
ony-murder in the first degree rested on an armed assault in
a dwelling with intent to commit a felony (G. L. c. 265,
§ 18A); felony-murder in the second degree was grounded
on the commission of extortion or attempted extortion (G. L.
c. 265, § 25).[11] The defendant objected to the felony-murder

---

[11] The issue of the validity of the charge on murder in the first degree
(including the felony-murder doctrine) is not before us in light of the jury

extortion charge, and, on appeal, argues that a charge on felony-murder cannot be predicated on the statutory felony of extortion.

The common law felony-murder rule is law in this Commonwealth. *Commonwealth* v. *Walden*, 380 Mass. 724, 728 n.2 (1980). *Commonwealth* v. *Balliro*, 349 Mass. 505, 512 (1965). "As developed by the case law, the felony-murder rule in the Commonwealth imposes criminal liability for homicide on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise." *Commonwealth* v. *Watkins*, 375 Mass. 472, 486 (1978). To make out a case of murder, the prosecutor need only establish that the defendant committed a homicide while engaged in the commission of a felony. *Id.* at 486-487. The effect of the felony-murder rule is to substitute the intent to commit the underlying felony for the malice aforethought required for murder. Thus, the rule is one of "constructive malice." *Id.*

The purpose of our murder statute, G. L. c. 265, § 1, is to gradate punishment and to categorize murder as murder in the first or second degree. The statute does not serve to transform a death, without more, into a murder. See *Commonwealth* v. *Ambers*, 370 Mass. 835, 839-840 (1976); *People* v. *Aaron*, 409 Mich. 672, 719 (1980). Under the charge given by the judge in this case, however, once the prosecutor proved the malicious intent required for the extortion charge, the jury, under G. L. c. 265, § 1, could return a verdict of murder in the second degree.

To ascertain whether a felony-murder jury charge can be predicated on the felony of extortion, we turn to the com-

---

verdict of murder in the second degree. The judge defined extortion or attempted extortion and added, "If you find . . . that the defendant was engaged in an attempted extortion, and that as a matter of probable consequence of the commission of that extortion, David Colvin was killed, then you would find the defendant Matchett guilty of murder in the second degree." The judge also instructed on murder in the second degree based on malice aforethought.

mon law as it presently exists in the Commonwealth and the United States.[12]

---

[12] The common law felony-murder rule is of questionable origin. See generally *People* v. *Aaron,* 409 Mich. 672, 689-698 (1980) (examining history of felony-murder doctrine). At early common law, when practically all felonies were punishable by death, the felony-murder rule went unchallenged. *People* v. *Aaron, supra* at 695-696. As execution was the end result of any felony conviction, it made little difference whether the guilty party was hanged for the homicide or the underlying felony. See *Powers* v. *Commonwealth,* 110 Ky. 386, 413 (1901). Therefore, little injustice was caused directly by application of the rule. R. Perkins, Criminal Law 44 (2d ed. 1969).

At the present time, however, "with the removal of most felonies from the category of capital crimes, the reason for the rule has ceased to exist." Perkins, *supra.* In 1957, England abolished the felony-murder rule, providing that "[w]here a person kills another in the course or furtherance of some other offence, the killing shall not amount to murder unless done with . . . malice aforethought." Homicide Act, 1957, 5 & 6 Eliz. 2, c. 11, § 1. Many States have abandoned or modified the felony-murder rule by statute. See, e.g., Del. Code Ann. tit. 11, §§ 635-636 (1979) (mens rea of recklessness or criminal negligence required); Haw. Rev. Stat. tit. 37, § 707-701 (1976) (abolishes common law felony-murder rule); Ky. Rev. Stat. § 507.020 (Supp. 1980) (no felony-murder rule); Me. Rev. Stat. Ann. tit. 17-A, § 202 (Supp. 1981) (death must be a reasonably foreseeable consequence of felony; sets affirmative defenses); N.H. Rev. Stat. Ann. § 630:1-b(I) (1974) (requires mens rea of knowingly or recklessly causing death; mens rea presumed by use of deadly weapon in attempt or commission of felony); Ohio Rev. Code Ann. § 2903.04 (Baldwin 1979) (homicide resulting from felony or attempt is involuntary manslaughter). See also Model Penal Code § 210.2 (Proposed Official Draft 1962) (presumption of extreme recklessness substituted for felony-murder rule). See generally Adlerstein, Felony-Murder in the New Criminal Codes, 4 Am. J. Crim. L. 249 (1976) (presenting a statutory taxonomy of American felony-murder law).

American courts have also abolished or severely limited the application of the felony-murder rule. See, e.g., *Commonwealth* v. *Devlin,* 335 Mass. 555, 566-567 (1957) (homicide must be natural and probable consequence of underlying felony); *People* v. *Aaron, supra* at 733 (abrogating the common law felony-murder rule); *State* v. *Montgomery,* 191 Neb. 470, 474-475 (1974) (ruling that killing must be used "to effectuate" felony); *People* v. *Moran,* 246 N.Y. 100, 102 (1927) (underlying felony must be independent of the homicide); *State* v. *Thompson,* 280 N.C. 202, 211 (1972) (felony underlying homicide must be inherently dangerous); *Burton* v. *State,* 122 Tex. Crim. 363, 366-367 (1932) (felony must proximately cause death). The numerous modifications and limitations placed on the felony-murder rule by courts and Legislatures "reflect dissatisfaction with the harshness and injustice of the rule." *People* v. *Aaron, supra* at 707.

Although a plethora of cases exists restating the common law felony-murder rule, this court has never applied the rule when the underlying felony was extortion.[13] Extortion, at common law, was a misdemeanor committed by an officer, who, under cover of office, unlawfully took money or anything of value not due, or more than due, or before it was due. See R. Perkins, Criminal Law 367 (2d ed. 1969); 35 C.J.S. Extortion § 1 (1960). See also *Commonwealth* v. *Cony*, 2 Mass. 523, 524 (1807). By statute, extortion may be committed by anyone who obtains money or any pecuniary advantage from another through the wrongful use of force or fear. The elements of the crime set forth in G. L. c. 265, § 25, are (1) a malicious threat (2) made to a named person (3) of personal injury to someone or damage to property of another (4) with intent to extort money or any pecuniary advantage. *Commonwealth* v. *DeVincent, supra.* The statutory crime carries a possible term in State prison and therefore is a felony. See G. L. c. 274, § 1.

This court has never automatically applied the felony-murder rule without viewing the facts of the case.[14] We re-

---

The "injustice of the rule" stems from the use of the legal fiction of "constructive malice," i.e., the intent to commit the underlying felony is substituted for the mens rea normally required to support a murder conviction. See generally Note, The Felony-Murder Rule: In Search of a Viable Doctrine, 28 Cath. Law. 133 (1978).

[13] A rule of law assumed, but not decided, is not binding on this court. Cf. *Lowell* v. *Boston*, 322 Mass. 709, 727, appeal dismissed sub nom. *McCarthy* v. *Boston*, 335 U.S. 849 (1948) (opinion must be construed with reference to facts found and issues presented; not authority for proposition not considered or determined).

[14] In both *Commonwealth* v. *Rego*, 360 Mass. 385 (1971), and *Commonwealth* v. *White*, 353 Mass. 409 (1967), cert. denied, 391 U.S. 968 (1968), this court reviewed convictions of murder in the first degree under G. L. c. 278, § 33E. The first degree murder convictions were set aside and verdicts of murder in the second degree were entered to avoid miscarriages of justice. *Rego, supra* at 396-397. *White, supra* at 426.

The court exercised its § 33E review power in *White* because "[t]he jury *could* have found either first or second degree murder" based upon facts indicating either robbery or breaking and entering. *Id.* (emphasis in original). The judge's charge, however, failed to distinguish between the elements of robbery and breaking and entering. Similarly, in *Rego,* the

quire, for example, that a homicide committed in the course
of a felony or attempted felony, be the natural and probable
consequence of the act. See *Commonwealth* v. *Devlin*, 335
Mass. 555, 556-567 (1957). We have never delineated ex-
actly which felonies give rise to application of the rule, nor
have we expressly limited its application to the common law
felonies.[15]

American courts, according to the drafters of the Model
Penal Code, have narrowed the scope of the felony-murder
rule by imposing one or more of the following limitations:
"(1) The felonious act must be dangerous to life. . . . (2)
The homicide must be a natural and probable consequence
of the felonious act. . . . (3) Death must be 'proximately'
caused. . . . (4) The felony must be *malum in se*. . . . (5)
The act must be a common law felony. . . . (6) The period
during which the felony is in the process of commission must
be narrowly construed. . . . [and] (7) The underlying fel-
ony must be 'independent' of the homicide." (Citations
omitted.) Model Penal Code § 201.2, Comment 4C (Tent.
Draft No. 9, 1959). Courts apply the felony-murder rule
"where the law requires, but they do so grudgingly and tend
to restrict its application where circumstances permit."
R. Perkins, Criminal Law 44 (2d ed. 1969).

---

trial judge erred in failing to instruct the jury that a verdict of murder in
the second degree *was possible* based upon evidence of breaking and
entering in the nighttime. *Rego, supra* at 395. Neither case, however,
affirmed a murder conviction based on the felony-murder rule with
breaking and entering or breaking and entering in the nighttime as the
underlying felony.

We do not view the instant case as a departure from the Commonwealth's
common law felony-murder rule because this court has never held that the
felony-murder rule was applicable to the statutory felony of extortion.

[15] The vast majority of felony-murder convictions in this Common-
wealth rest on the inherently dangerous common law felonies of arson,
rape, burglary, and robbery. See, e.g., *Commonwealth* v. *Hicks*, 377
Mass. 1 (1979) (robbery); *Commonwealth* v. *Watkins*, 375 Mass. 472
(1978) (robbery and kidnapping). The statutory felonies on which a mur-
der conviction has been upheld have also included inherently dangerous
felonies. See, e.g., *Commonwealth* v. *Walden*, 380 Mass. 724 (1980)
(breaking and entering with intent to commit larceny *and* to put a person
therein in fear).

The basis of the modern felony-murder rule in England, before the rule was abolished by statute, was *Regina* v. *Serne*, 16 Cox Crim. Cases 311, 313 (Central Crim. Ct. 1887). R. Moreland, The Law of Homicide 43 (1952). In that case it was alleged that Serne and another set fire to a house and shop in order to collect the insurance proceeds. *Serne*, *supra* at 311. Serne's son died in the fire, and the prisoner was charged with murder. The jury was instructed on the felony-murder rule. Judge Fitzjames Stephen, an avid critic of the felony-murder rule,[16] instructed the jury: "[T]he definition of the law which makes it murder to kill by an act done in the commission of a felony might and ought to be narrowed . . . . [I]nstead of saying that any act done with intent to commit a felony and which causes death amounts to murder, it would be reasonable to say that any act known to be dangerous to life, and likely in itself to cause death done for the purpose of committing a felony which caused death, should be murder." *Serne*, *supra* at 313.

The felony-murder rule articulated in *Regina* v. *Serne* is followed by many American courts and, in some States, is incorporated into a felony-murder statute. See, e.g., *People* v. *Washington*, 62 Cal. 2d 777 (1965); *People* v. *Goldvarg*, 346 Ill. 398 (1931); *State* v. *Moffitt*, 199 Kan. 514 (1967); *State* v. *Thompson*, 280 N.C. 202 (1972); *Wade* v. *State*, 581 P.2d 914 (Okla. Crim. App. 1978); *Commonwealth* v. *Bowden*, 456 Pa. 278 (1973); Tex. Penal Code Ann. tit. 5, § 19.02(a)(3) (Vernon 1974). The reasons for limiting the felony-murder rule to those felonies that are inherently dangerous are sound and in accord with theories of criminal justice.

A felony-murder rule that punishes all homicides committed in the perpetration of a felony whether the death is intentional, unintentional or accidental, without the neces-

---

[16] Moreland, who views the felony-murder rule as "fundamentally unsound," states that Judge Stephen in an "open, vigorous, vitriolic attack upon the [felony-murder] doctrine" found it without adequate support by any authority. R. Moreland, The Law of Homicide 42-43 (1952), citing 3 F. Stephen, History of the Criminal Law of England 57-75 (1883).

sity of proving the relation of the perpetrator's state of mind to the homicide, violates the most fundamental principle of the criminal law — "criminal liability for causing a particular result is not justified in the absence of some culpable mental state in respect to that result." *People* v. *Aaron, supra* at 708, quoting from Gegan, Criminal Homicide in the Revised New York Penal Law, 12 N.Y.L.F. 565, 586 (1966). The erosion of "the relation between criminal liability and moral culpability" by application of the felony-murder rule should dissuade a court from extending the rule beyond any rational function it was designed to serve. *People* v. *Washington,* 62 Cal. 2d 777, 783 (1965).

As noted earlier, the felony-murder rule is based on the theory that the intent to commit the felony is equivalent to the malice aforethought required for murder. "For this theory to be tenable the nature of the felony must be such that an intent to commit that crime exhibits a conscious disregard for human life, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty. Where, however, the acts which constitute felonious conduct do not possess a sufficient danger to human life to justify the application of the doctrine of common-law felony murder, the doctrine is inapplicable because there is a failure to establish the requisite state of mind from the forming of the intention to commit the felony." *Commonwealth* v. *Bowden, supra* at 287 (Nix, J., concurring). Accord, O. Holmes, The Common Law 58 (1881); R. Perkins, Criminal Law 44 (2d ed. 1969).

There exist many statutory felonies which have no natural tendency to cause death and are less serious than the common law felonies which gave rise to the rule. See, e.g., G. L. c. 266, § 49 (possession of burglarious instruments); G. L. c. 266, § 60 (buying or receiving stolen property). If a person drives his car to a place to receive stolen property and, en route, kills a pedestrian on the highway, is this felony-murder? If one calls his neighbor and threatens personal injury or property damage in an attempt to gain an unlawful pecuniary advantage and the neighbor proceeds to

commit suicide or becomes upset and has a heart attack, should one be charged with murder? We think not.

We hold today that, when a death results from the perpetration or attempted perpetration of the statutory felony of extortion, there can be no conviction of felony-murder in the second degree unless the jury find that the extortion involved circumstances demonstrating the defendant's conscious disregard of the risk to human life. The crime of extortion may be committed in a way not inherently dangerous to human life. See *Jenkins* v. *State*, 240 A.2d 146 (Del. 1968), aff'd, 395 U.S. 213 (1969). We conclude, therefore, that the judge's charge was in error.[17]

3. *Automobile search.* We consider briefly, for the purpose of guidance in the event of a new trial on the homicide charge, and, in order to pass on the defendant's challenge to the firearm convictions, the defendant's exception to the judge's ruling denying the defendant's motion to suppress certain items seized from his car by the Pittsfield police. The items seized from the vehicle include a loaded .25 caliber pistol, a sawed-off shotgun, a sword cane, a number of rounds of ammunition, and a letter from the Stoughton police department revoking Matchett's license to carry firearms. The defendant contends that the warrantless search of his automobile violated his constitutionally protected privacy interests, and, accordingly, all evidence seized from within the defendant's car should be suppressed. We disagree.

On May 24, 1979, an evidentiary hearing was held on the motion to suppress all the above-mentioned items except the letter from the Stoughton police.[18] The two police officers

---

[17] The conclusion we reach vitiates the need, in this case, to discuss the constitutionality of the felony-murder rule.

[18] On September 4, 1979, the defendant filed an additional motion to suppress relating to "[a] letter from the Stoughton Police Department and other personal papers and effects contained" in a briefcase found within the defendant's car. No evidentiary hearing was conducted on this motion. Certain representations of fact were accepted as true by the judge and, upon that basis, the motion to suppress was denied. The defendant does not contest the validity of the search of the briefcase independently from the illegality of the initial seizure during the search of his vehicle.

who conducted the search of Matchett's car at the police sta-
tion, as well as the two arresting officers, testified to the fol-
lowing facts.

On the basis of information supplied by Brian Stack, the
police broadcast a county-wide bulletin to alert all police
that there had been a shooting and to provide them with a
description of the automobile and its contents. The bulletin
described the automobile as a brown Ford LTD station
wagon with some damage on its front end, and the occu-
pants of the automobile as two white males, one with a
short red beard. The bulletin further stated that there was
a large German shepherd dog in the vehicle.

A State trooper, on patrol, saw a station wagon matching
the description, radioed for a backup, and followed the car
until it stopped outside a bar in Huntington. The trooper
advised Matchett that he was under arrest for a felony and,
in the course of a search pursuant to that arrest, found a .38
caliber revolver in Matchett's pocket.[19] The backup trooper
placed Samson under arrest.

The station wagon was towed from Huntington to the
Pittsfield police garage. There, the police conducted an in-
ventory search of the vehicle and found a loaded .25 caliber
pistol, a number of rounds of ammunition, a sawed-off shot-
gun, a sword cane, and a letter from the Stoughton police
department revoking Matchett's license to carry firearms,
and other various items. The police made an inventory of all
the items found and seized the weapons and ammunition as
contraband. The search was conducted without a warrant.

The Supreme Court of the United States has held that an
inventory search of an impounded motor vehicle is not un-

---

[19] The arresting officer testified at trial that the gun was fully loaded
when seized and smelled as if it had been recently fired. A ballistic expert
at trial identified the revolver as the gun which had fired two bullets, one
of which was recovered from the body of David Colvin and the other
which was found in the wall of the Colvin house. The arresting officer
also recovered a set of handcuffs from Matchett's pocket, some cartridge
cases on his belt, and a long knife strapped to his leg inside his boot. The
defendant does not contest the legality of the seizure of this pistol and the
other objects seized at the time of the defendant's arrest.

reasonable under the Fourth Amendment to the Constitution of the United States if carried out in accordance with standard procedures and if there is no suggestion that the procedure was a pretext concealing an investigatory police motive. See *South Dakota* v. *Opperman,* 428 U.S. 364, 376 (1976). Such inventories reasonably may be considered necessary for the purpose of protecting the car or its contents, for the purpose of protecting the police against unfounded charges of misappropriation of such property, for the purpose of protecting the public against the possibility that the car might contain weapons or other dangerous instrumentalities which might fall into the hands of vandals, or for a combination of such reasons. *Id.* at 369. The court made clear that no warrant is required for such a search if the search was carried out pursuant to standard police procedures. *Id.* at 376. In the trial judge's denial of the defendant's motion to suppress, the judge found that the "inventory search was conducted as a matter of routine, standard police procedure" and was "not a mere pretext concealing an investigatory police motive." The Appeals Court, in *Commonwealth* v. *Tisserand,* 5 Mass. App. Ct. 383, 386-387 (1977), held that "taking an inventory of the contents of a car about to be towed or impounded is a reasonable procedure; and the fact that the searching officer may have harbored a suspicion that evidence of criminal activity might be uncovered as a result of the search should not vitiate his obligation to conduct the inventory." This court in *Commonwealth* v. *Benoit,* 382 Mass. 210, 219 (1981), and *Commonwealth* v. *White,* 374 Mass. 132, 140 (1977), aff'd by an equally divided court, 439 U.S. 280 (1978), has indicated that a warrantless search, conducted for some legitimate police purpose, other than a search for evidence, may be recognized as a lawful inventory search.[20]

---

[20] The Commonwealth made no argument at trial or before us that the seizure of the various items from the motor vehicle may be viewed as lawful under the alternative theory of a warrantless automobile search. See *Chambers* v. *Maroney,* 399 U.S. 42 (1970). See also Liacos, Criminal Law — Warrantless Automobile Searches: The Meaning of Chambers v. Maroney, 34 J. Am. Trial Law. A. 174 (1972). Consequently, we do not consider this theory in determining the validity of police conduct.

The trial judge's conclusion that the police conducted a lawful inventory search pursuant to standard police procedure was based entirely on oral testimony. "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses . . . . In such a situation, where subsidiary findings of fact have been made by the trial judge, they will be accepted by this court, and we do not substitute our judgment for his, absent clear error." *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). We cannot say on this record that the judge erred in finding that the police engaged in a lawful inventory search of the defendant's automobile and, therefore, we affirm the judge's denial of the motion to suppress.

4. *Disposition.* We do not speculate on whether the jury returned a verdict of murder in the second degree based on a finding of express malice aforethought or the felony-murder doctrine. See *Yates* v. *United States*, 354 U.S. 298, 311-312 (1957) (verdict must be set aside where verdict supportable on one ground but not on another and impossible to tell which ground jury selected). Cf. *Commonwealth* v. *Ferguson*, 384 Mass. 13, 19 (1981). There was sufficient evidence of malice aforethought apart from the use of any felony-murder theory to have supported a verdict of guilty of murder in the second degree. The circumstances of the attempted extortion here involved would have also supported a charge that the means utilized to effect the extortion could be considered by the jury on the issue of malice, i.e., whether these means and the methods used by the defendant demonstrated a conscious disregard of the risk to human life. Such a charge was not given, however, and hence the murder conviction must be set aside and the matter set for a new trial on the murder indictment.

The judgment on the indictment for murder is therefore reversed, the verdict is set aside, and the case is remanded to the Superior Court for a new trial. The judgments on the firearms indictments are affirmed.

*So ordered.*

NOLAN, J. (dissenting). I dissent. The defendant went to the victim's house armed with two loaded guns, a sawed-off shotgun, a large dog, a knife, and handcuffs in order to earn the money paid to him by Samson to collect an old gambling debt. In this setting, the victim was killed. It borders on the fanciful to deny that one of the natural and probable consequences of such attempted extortion is homicide. See *Commonwealth* v. *Devlin,* 335 Mass. 555, 566-567 (1957). In fact, in terms of what is inherently dangerous (see note 15, *supra*), it is difficult to say what is more dangerous — arson, burglary, robbery and larceny on the one hand, or the crime of attempted extortion committed in this case. Hence, if such crimes as arson, burglary, robbery and larceny can be the basis for the application of the felony-murder rule, so too should the attempted extortion perpetrated in this case. We should not hesitate to apply the felony-murder rule to these facts simply because extortion was a misdemeanor at common law. We should look to the present status of extortion. It is a felony punishable by imprisonment in the State prison for a term up to fifteen years. Consistent, then, with the language in *Commonwealth* v. *Rego,* 360 Mass. 385, 395 (1971), and *Commonwealth* v. *White,* 353 Mass. 409, 414 (1967), cert. denied, 391 U.S. 968 (1968), we should approve the judge's instructions on the felony-murder rule in this case. See also *Commonwealth* v. *Gricus,* 317 Mass. 403, 411-412 (1944).