## COMMONWEALTH vs. RONALD TROY.

Essex. May 3, 1989. — June 28, 1989.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Rape. Felony-Murder Rule. Intoxication. Evidence*, Scientific test. *Practice, Criminal*, Instructions to jury, Preservation of evidence, Loss of evidence by prosecution.

In a murder case, there was no merit to the defendant's contention that the prosecution's destruction of blood samples taken from him shortly after his arrest deprived him of evidence to support a defense of lack of criminal responsibility by reason of intoxication, where the defendant was tried and convicted on the theory of felony-murder in which the underlying felony was aggravated rape, an offense that is not mitigated by a defendant's voluntary intoxication. [260]

A criminal defendant did not demonstrate that the loss of potentially exculpatory evidence infringed any constitutional right or prejudiced him so as to require dismissal of the murder and rape indictments against him. [261-262]

At a murder trial the judge properly instructed the jury with respect to the felony-murder doctrine and with respect to the underlying felony of rape. [262-263]

A verdict of murder in the first degree in a felony-murder case was held, in the circumstances, to be consonant with justice and not appropriate for any exercise of this court's power under G. L. c. 278, § 33E, to reduce the verdict. [263]

INDICTMENTS found and returned in the Superior Court Department on October 8, 1986.

A motion to dismiss was heard by *John T. Ronan*, J., and the cases were tried before him.

*Thomas J. Barrett* for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. The defendant, Ronald Troy, appeals from convictions of the first degree murder and aggravated rape of a

seventy-nine year old woman.[1] We affirm the defendant's convictions.

At approximately 8:40 A.M. on August 20, 1986, the victim's body was found in her Gloucester home by her niece. The victim was lying face down in her bed with a sheet covering her body. The niece observed blood around her aunt's mouth and her bare shoulder felt cold to the touch. The niece also noted that the bottom half of one window, along with its screen, was opened.

Dr. Sidney Wedmore, an assistant medical examiner for eastern Essex County, arrived at the victim's residence at about 11:15 A.M. The doctor observed that there was a cord around the victim's neck and some dried blood on her face coming from her ear. The doctor pulled down the sheet which was partially covering the body and noted that the victim's nightgown along with her bed clothes and underwear, were lying under the sheet at her feet. He reported that there were dried feces on the victim's lower back and also between her shoulder blades, feces around the rectal area and feces on the sheet that had covered her.

An autopsy performed by Dr. Robert E. Belliveau later that day revealed extensive internal pelvic bleeding and two vaginal lacerations which, the doctor testified, indicated that there had been forceful penetration of the vagina by a blunt instrument. Dr. Belliveau testified that the autopsy revealed that the penetration occurred prior to the victim's death. The cause of death was asphyxiation by strangulation.

State and local police officers were called to the scene. Sergeant George D. MacDougall of the State police, an expert in fingerprint analysis, "processed" the inside of the window sill of the opened window and discovered six latent impressions on the left-hand side. He testified that he believed the prints were consistent with someone reaching inside the window from the outside of the house.

---

[1] The defendant advances no arguments on his conviction for burglary and assault on one lawfully in a dwelling. Therefore, we address only the issues that touch his conviction of felony-murder. G. L. c. 278, § 33E (1986 ed.).

The defendant's fingerprint cards, on file with the Gloucester police department, were retrieved and MacDougall compared them with the latent prints found on the sill. He testified that as to each of the six prints, he found between fourteen and fifty-one points of comparison, with eight points of comparison being required for a positive identification.

An arrest warrant for the defendant issued as did two search warrants, one for the defendant's residence and one for his person to obtain hair and saliva samples. The defendant was arrested at approximately 7 P.M. on August 20. He was handcuffed, placed in the back of the police car, and informed of his Miranda rights. The defendant indicated that he would remain silent. He then asked "what was this all about" and the police officer responded that everything would be explained to him when they arrived at the police station. The officers did not note any odor of alcohol nor did the defendant manifest difficulty in speaking or understanding what was said to him.

Once at the police station he was taken into the library area. He was again read his Miranda rights. The defendant read the rights himself and signed the Miranda form, noting the date and time. He was then informed that he was under arrest for murder, and also informed of the victim's name and address.

First, the defendant declared that he had been out that night with a woman named Diane from Maine. The defendant then stated that he knew all the people on the victim's street and that he had never been in that house before. The police informed the defendant that his fingerprints had been found inside the house and the defendant then admitted that he had broken into the house. He claimed that he had been drinking but that he had not taken any drugs. Moreover, he stated that he had not taken phenobarbital, an anti-seizure drug that had been prescribed for him.

At this point one of the police officers asked the defendant to relate his activities after 5 P.M. on the night of August 19. The defendant stated that he had visited a number of bars in Gloucester and that he had been drinking. After leaving a bar at about 9 P.M., he passed by the victim's house and decided to break into "the old lady's house." He recounted that he

moved around the house from window to window until he located one that opened. He entered the house and proceeded to the victim's bedroom and began looking through her bureau drawers. Initially, the defendant maintained that he saw the victim lying on the bed with what he believed to be blood on her back. The defendant claimed he left immediately for home.

Upon arriving home, the defendant stated that he watched television until approximately 10:45 P.M. when he left to keep his prearranged date with Diane on Eastern Avenue. The defendant claimed that Diane picked him up at 11 P.M., that they were alone together until about 2:30 A.M. on August 20, and that he then returned home. At this point, one of the officers mentioned that, if the defendant had called Diane in Maine to make the date then her telephone number would appear on his telephone bill. The defendant then became remorseful and stated that he could not face his mother. Moreover, he stated that he hoped he had not killed the victim and then asked, if found guilty, would he go to jail for the rest of his life.

The defendant explained to the police that he had been in a motorcycle accident five years earlier and, to prevent seizures, had been prescribed phenobarbital. He mentioned that he had not taken the medication and he could have had a seizure, during which he may have killed the victim.[2] The defendant agreed to tell the police what actually happened that night.

The defendant admitted that, as he had stated earlier, he had been drinking but that he did not leave the bars until about 1:00 A.M. He started walking home and decided to break into the victim's house and did so in the manner that he had described earlier. While he was in the victim's bedroom rummaging through the bureau drawers, the defendant stated, the victim woke up and began yelling. He put his hand over her mouth and began to choke her. He then removed a cord from her nightgown, placed it around her neck and choked her until she stopped struggling. He felt for a pulse and found none. He said that he realized that he had feces on his hands and wiped

[2] The record reflects that, in the five years following the motorcycle accident, the defendant had suffered two seizures.

them on the victim's back. He stated that he did not remember raping the woman. He returned home where he was met by his mother, who told him that he had better be up in the morning for work. When he did get up at 7:00 A.M., that morning he still had feces on his hands. He met that morning with his employer, who testified that the defendant was coherent and manifested no signs of intoxication.

The officer read the notes back to the defendant and asked if anything should be changed. The defendant indicated no changes. The officer then handed the notes to the defendant so that he could read them. The defendant asked questions about certain abbreviations. He initialed each page and signed the notes at the end. The police stated that the defendant had no difficulty comprehending what was said to him or in speaking to them.

The defendant's hands were tested by a State chemist for the presence of "occult" blood. The chemist defined occult blood as that which cannot be seen by the naked eye but can be detected chemically. The test results indicated the presence of blood on the defendant's hands.

When asked if he would like to see his father, the defendant replied: "[N]o, I don't want to speak to him. I can't face him. I don't want to face anybody. I'm ashamed of what happened." Prior to the defendant's arraignment on August 21, he was taken to Addison Gilbert Hospital in Gloucester for wipings of his genital area. The officers who accompanied him stated that the defendant did not have difficulty walking, speaking, or understanding what was happening at that time.

Prior to arraignment, Dr. David Swenson, a court psychiatrist, examined the defendant regarding his competency. The doctor took the defendant's medical history and the defendant related that he had taken four white pills, alleged to be amphetamines. The defendant stated that they made him "very sleepy." The defendant indicated to the doctor that he wanted to kill himself. Accordingly, Dr. Swenson concluded that there was doubt as to the defendant's competency and the arraignment judge ordered that the defendant be sent to Bridgewater State Hospital for the statutory observation period. G. L. c. 123, § 15 (*b*) (1986 ed.).

Counsel was appointed at the arraignment on August 21, 1986. Counsel for the defendant moved that blood samples be taken for "blood screening." The judge allowed the motion and the defendant was taken to the emergency room at Addison Gilbert Hospital where four vials of the defendant's blood were drawn. The blood was then taken by a police officer to the State chemistry laboratory for testing.

The blood was received at the laboratory and placed in a refrigerator. The court order had evidently become detached from the blood samples by this time and it appears that no laboratory employee was sure what tests to run on the blood. Nor did laboratory employees realize that the blood was the defendant's evidence and not the Commonwealth's. At some point a swatch of the blood was frozen and, because a rape was involved, the blood was tested to see whether the defendant was a secretor or not. No other tests were performed on the blood. In early October, a chemist in the laboratory came across the vials in the refrigerator. Acting according to laboratory policy and believing that no further tests were to be performed, he disposed of the blood. He then may have rinsed the vials and placed them in the locker with other evidence collected in the case.

Shortly thereafter Corporal Connolly of the State police called regarding the results of the drug screening. Connolly was informed that the blood had been disposed of and that no drug screening tests had been performed.

The defendant then moved to dismiss the indictments, based on the destruction of potentially exculpatory evidence material to his defense. The defendant maintained that the evidence was relevant to establishing the defense of lack of criminal responsibility and in suppressing statements made to the police.

The defendant also sought to screen for the presence of drugs any residual blood contained in the vials. Tests were run at a laboratory in Missouri on the residue and, although the results came back "non-detected" for all the major drug groups, the motion judge specifically found the results nonconclusive because the results may have been induced by the washing out or rinsing of the vials.

The swatch of blood frozen in the laboratory was tested for phenobarbital. None was found. No adequate blood sample remained on which to perform further tests for drugs.

The motion judge, who was also the trial judge, ruled that the Commonwealth's loss of the evidence was "careless." Accordingly, he performed the requisite balancing test. The judge did not dismiss the indictments. He prohibited the Commonwealth from going forward at trial on the theory of murder in the first degree by reason of extreme atrocity or cruelty. The judge also stated that, if the Commonwealth proceeded on the theory of murder in the first degree by deliberate premeditation, the defendant could show that the Commonwealth negligently destroyed the blood samples and further, that the defendant was entitled to a jury instruction that the jury could draw inferences adverse to the prosecution's case based on the destruction of the evidence. The defendant petitioned for relief to a single justice of this court. G. L. c. 211, § 3 (1986 ed.). That petition was denied.

The Commonwealth did proceed on the theory of murder in the first degree by reason of premeditation. The Commonwealth also proceeded on the theory of first degree felony-murder with aggravated rape as the underlying felony. The judge instructed on both these theories and also instructed that, on the deliberate premeditation aspect, the jury could draw adverse inferences from the Commonwealth's loss of the defendant's blood specimens. The judge also instructed the jury on the elements of the crimes of aggravated rape and of breaking and entering a dwelling and assaulting one lawfully therein. On each crime requiring specific intent the judge instructed that the defendant's intoxication by alcohol or by drugs could be considered by them in determining whether the defendant had the ability to form the requisite intent.

The jury were given special verdict slips on which were marked the crimes charged. The slips revealed that the jury found the defendant guilty on the felony-murder charge but not guilty of murder in the first degree by reason of premeditation. The defendant was also convicted of aggravated rape and of breaking and entering a dwelling and assaulting one lawfully therein.

The defendant raises three issues on appeal: (1) that he was denied his right to a fair trial and irremediably harmed by the Commonwealth's seizure and destruction of his blood samples; (2) that the judge's instruction regarding felony-murder was erroneous and requires a new trial; and (3) that justice requires that the defendant's conviction of murder in the first degree be reduced to a lesser degree of guilt.

1. *Loss of the defendant's blood samples.* The defendant maintains that destruction of the blood samples deprived him of the defense of lack of criminal responsibility for his actions. He argues that the blood screening could have produced evidence material to his defense. On the defendant's conviction of felony-murder, we disagree. As we discuss below, the blood specimens taken thirty-six hours after the killing could have produced no evidence relevant to the jury's determination on the issue of felony-murder in this case.

The defendant was tried and convicted of first degree felony-murder, with aggravated rape as the underlying felony. Although felony-murder requires the element of malice aforethought, the "effect of the felony-murder rule is to substitute the intent to commit the underlying felony for the malice aforethought required for murder." *Commonwealth* v. *Matchett,* 386 Mass. 492, 502 (1982). The defendant relies on *Commonwealth* v. *Henson,* 394 Mass. 584 (1985), for the proposition that the defendant was entitled to an instruction on the effect of intoxication on his ability to form the requisite intent to commit the underlying felony, in this instance, aggravated rape. Such reliance is misplaced. It is well established in this Commonwealth that, where there is no element of specific intent, a defendant is not entitled to an instruction on the effect intoxication may have had on the defendant's ability to form intent. *Id.* at 592, and cases cited.

The crime of rape is a general intent crime, *Commonwealth* v. *Grant,* 391 Mass. 645, 649-650 (1984), and therefore voluntary intoxication has no mitigating effect. Indeed, even assuming, arguendo, that the defendant's blood samples revealed high levels of drugs, the evidence would have been irrelevant on this charge.

When potentially exculpatory evidence is lost or destroyed, the court must perform a balancing test to determine what remedial action, if any, is necessary. *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). Those factors to be considered include the culpability of the Commonwealth, the materiality of the evidence and the potential for prejudice to the defendant. *Id.* See *Arizona* v. *Youngblood*,      U.S.      ,   -   (1988) (109 S. Ct. 333, 334-337 [1988]) (failure to preserve potentially useful evidence not denial of due process absent bad faith by government).[3] The judge adequately performed this balancing test.

Despite the mishaps at the laboratory, the judge was warranted in not dismissing the indictments since "dismissal of a criminal case is a remedy of last resort because it precludes a public trial." *Commonwealth* v. *Cronk*, 396 Mass. 194, 198 (1985). Here the judge noted that the Commonwealth was "careless." Moreover, the actions taken by the judge were sufficient to protect the defendant's constitutional rights. The judge prohibited the Commonwealth from proceeding on a charge of murder in the first degree by reason of extreme atrocity or cruelty. He also instructed the jury on three occasions that, on the indictment charging murder in the first degree by reason of deliberate premeditation, the jury could draw adverse inferences from the loss of the blood samples. Accordingly, the defendant suffered no irremediable harm.

In *Commonwealth* v. *Neal*, 392 Mass. 1 (1984), we determined that where potentially exculpatory evidence is lost, the defendant must establish a " 'reasonable possibility, based on concrete evidence rather than fertile imagination,' that access to the [evidence] would have produced evidence favorable to his cause" (citation omitted). *Id.* at 12. As we noted above, even assuming that the blood samples had yielded significant amounts of drugs, such evidence would not have exculpated

---

[3] The judge in this instance found that the destruction of the blood samples was "careless." He attributed the destruction, in part, to the lack of internal administrative procedures that existed in the laboratory at the time which also fostered personnel problems in the laboratory. The judge also noted that the Commonwealth "made earnest efforts to preserve and secure testing of the residual materials" once the destruction of the blood was discovered.

the defendant of the crimes charged. The defendant, therefore, has not met his burden under *Commonwealth* v. *Neal, supra.*

2. *Jury instructions on felony-murder.* The defendant presents a twofold argument with respect to the judge's jury instructions: (1) that the judge's failure to instruct the jury that they must find that the defendant intended to commit the underlying felony deprived him of his right secured by the Fourteenth Amendment to the United States Constitution; and (2) that it was error to fail to instruct on the effects of intoxication when applying the felony-murder doctrine. The defendant's arguments are without merit.

As previously noted, the effect of the felony-murder rule in this instance is to substitute the intent to commit the felony of rape for the malice aforethought required for murder. *Commonwealth* v. *Moran*, 387 Mass. 644, 649 (1982). In *Commonwealth* v. *Matchett*, 386 Mass. 492 (1982), we examined the fairness of the felony-murder rule and determined that a defendant cannot be convicted under the rule unless the jury find that the underlying crime involved circumstances which demonstrated the defendant's "conscious disregard of the risk to human life." *Id.* at 508. Aggravated rape, the felony of which the defendant stood accused, is an inherently dangerous felony. *Id.* at 505 n.15. The judge's charge to the jury that the commission of the crime of aggravated rape satisfied the malice requirement for murder was, therefore, proper.

Moreover, the judge's charge regarding the elements of the crime of rape was also proper. He instructed that rape required penetration of the victim's vagina by sexual intercourse or by some object, accomplished by force or by threat of force by the defendant. The defendant's Fourteenth Amendment rights were adequately protected where the jury were instructed that the Commonwealth had to prove all elements beyond a reasonable doubt. Specific intent is not required for the crime of rape and thus no instruction on it was necessary. See *Commonwealth* v. *Grant*, 391 Mass. 645, 650-651 (1984).

The defendant's second argument, that the judge failed to give an instruction regarding the effect of alcohol on the defendant's ability to form the requisite intent, is unpersuasive. As

previously discussed, intoxication has no mitigating effect for general intent crimes such as rape. *Commonwealth* v. *Henson*, 394 Mass. 584, 592 (1985). *Commonwealth* v. *Grant, supra.* Accordingly, there was no error in the judge's declining so to instruct the jury.

3. *Lesser degree of guilt.* The defendant urges us to exercise our power under G. L. c. 278, § 33E (1986 ed.), and reduce the defendant's conviction to a lesser degree of guilt. The defendant argues that his background is similar to that of the defendant in *Commonwealth* v. *McDermott*, 393 Mass. 451, 460-461 (1984). We disagree. In *McDermott*, we considered not only the defendant's age and background but other circumstances in the case. While the defendant in this case shared some common characteristics with the defendant in *McDermott*, the circumstances of their respective murders differ markedly. Here, the defendant was not placed in fear of rape or bodily harm. He entered the home, in the early morning hours, of a seventy-nine year old woman, raped her, and then murdered her. Moreover, we concluded in *McDermott* that an error in the jury instructions was the most important reason for reducing the verdict of murder in the first degree. *Id.* at 461. As we have already concluded above, there was no such error here.

The circumstances support the conclusion that the verdict of murder in the first degree was consonant with justice. Accordingly, we affirm the convictions.

*Judgments affirmed.*